## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | **03 C 98** | **DATE** | August 27, 2003 |
| **CASE TITLE** | Shanri Holdings  v  K Mart Corp. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due ____ __.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Hearing

(5) ☐ Status hearing

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at ____ __.

(7) ☐ Trial[set for/re-set for] on __ ____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to __ ____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]

Memorandum opinion and order entered. Accordingly, the instant case is **remanded** to the bankruptcy court.

(11) ☐ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| X | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | AUG 2 9 2003 | *27* |
| | Docketing to mail notices. | | date docketed | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT | docketing deputy initials | |
| GDS | courtroom deputy's initials | 03 AUG 28 PH 12:07 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE ) 
KMART CORPORATION, et al., ) Bankruptcy Case No.: 02 B 02474
 )
Debtors. ) Adversary No. 02 A 00814
_____ )
 )
SHANRI HOLDINGS CORP., )
 )
Appellant, )
 ) No. 03 C 0098
v. )
 ) Judge Robert W. Gettleman
KMART CORPORATION, )
 )
Appellee. )

## MEMORANDUM OPINION AND ORDER

This matter is before the court on appeal from a dismissal by the bankruptcy court, with

prejudice, for failure to state a claim upon which relief could be granted. For the reasons stated

herein, the instant case is remanded to the bankruptcy court for action consistent with this opinion.

## FACTS

On November 27, 1997, Shanri Holdings Corp. ("Shanri"), Kmart Corp. ("Kmart"), and

Builders Square, Inc. entered into a "Termination of Lease and Settlement Agreement" (the

"Settlement Agreement"), which settled pending litigation arising from Builders Square's

rejection of its property lease with Shanri.[1] The Settlement Agreement, which is governed by

Rhode Island law, specifically provided, among other things, that upon Shanri's satisfaction of

certain conditions precedent, Kmart would pay Shanri $3,500,000. The $3,500,000 was secured

---

[1] Kmart was a party to the litigation because it had guaranteed all of Builders Square's
obligations under the lease with Shanri.



by a letter of credit (the "letter of credit") issued by Chase Manhattan Bank (the "Bank") and payable to Shanri upon delivery of certificates executed by both Kmart and Shanri acknowledging that the conditions precedent were satisfied.

After Kmart filed for bankruptcy, Shanri satisfied the conditions precedent and requested that Kmart sign a certification acknowledging that those conditions had occurred, so that Shanri could draw on its letter of credit. Although it is undisputed that Shanri satisfied the conditions precedent, Kmart refused to sign the certification. This prompted Shanri to institute an adversary proceeding in the Bankruptcy Court seeking specific performance of Kmart's obligation to sign the certification.

According to the parties' joint stipulation of facts,[2] as of the date of Kmart's bankruptcy petition, the Bank was an undersecured creditor of Kmart. Under Kmart's First Amended Joint Plan of Reorganization, dated February 25, 2003, almost all of the unsecured creditors "will receive their pro rata share of 31,945,161 shares of common stock in reorganized Kmart," which "represents approximately 37% of all such common stock to be issued under the Plan." Notably, however, Section 5.3 of Kmart's First Amended Joint Plan of Reorganization provides, in pertinent part:

> In addition, with respect to each letter of credit outstanding under the Prepetition Credit Agreements as of February 20, 2003, the Reorganized Debtors shall, as soon as practicable after the Effective Date, (i) obtain a replacement letter of credit, (ii) provide cash collateral equal to 105% of the face amount of the letter of credit, or (iii) if such letter of credit has been drawn, reimburse the Prepetition Lenders (or issuing bank, as

---

[2] At the court's request, the parties submitted a "Joint Stipulation" as to the facts regarding, (1) whether the Bank was over- or under-secured as to Kmart, (2) Kmart's Plan of Reorganization, and whether it covered the letter of credit, and (3) the potential effect on other creditors if Shanri is permitted to draw on its letter of credit.

applicable) with respect to such drawn letter of credit in full in Cash on the Effective Date.

Thus, on May 6, 2003, pursuant to Section 5.3, reorganized Kmart cash collateralized the $3.5 million Shanri letter of credit at 105% plus fees, which means that, if Shanri draws on the letter of credit, the Bank will collect $3.5 million (plus any taxes and reasonable fees and costs the Bank incurs in connection with the payment of the letter of credit) of reorganized Kmart's assets.

In an oral ruling on November 26, 2002, the bankruptcy court dismissed Shanri's adversary proceeding under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief could be granted, concluding that Shanri had a "claim" as defined by Section 101(5) of the Bankruptcy Code, 11 U.S.C. § 101(5), that was subject to the claims administration process.

## DISCUSSION

The court has jurisdiction to hear the instant appeal under 28 U.S.C. § 158 (a)(1), which provides that "[t]he district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders and decrees ... of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title." On appeal, the bankruptcy court's rulings and conclusions of law are reviewed de novo, Meyer v. Rigdon, 36 F.3d 1375, 1378 (7th Cir. 1994), and its findings of fact shall not be set aside unless they are clearly erroneous. Fed. R. Bankr. P. 8013.

The central issue on appeal is whether Shanri's adversary suit seeking the equitable remedy of specific performance qualifies as a "claim" under the Bankruptcy Code that should be

liquidated in the claims allowance process, rather than tried as an adversary proceeding. Section

101(5) defines a "claim" as:

> (A)     a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
>
> (B)     a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

With respect to Section 101(5), which was formerly designated Section 101(4)(B), a

sponsor of the Bankruptcy Reform Act stated:

> This [section] is intended to cause the liquidation or estimation of contingent rights of payment for which there may be an alternative equitable remedy with the result that the equitable remedy will be susceptible to being discharged in bankruptcy. For example, in some States, a judgment for specific performance may be satisfied by an alternative right to payment, in the event performance is refused; in that event, the creditor entitled to specific performance would have a 'claim' for purposes of proceeding under title 11.

124 Cong. Rec. 32393 (1978) (remarks of Rep. Edwards).

Thus, a right to an equitable remedy for breach of performance is a "claim" under Section

101(5)(B) if it can be satisfied by an alternative right to payment. See In re Udell, 18 F.3d 403,

407 (7th Cir. 1994) ("[T]he legislative history shows that one example of a 'claim' is a right to an

equitable remedy that can be satisfied by an 'alternative' right to payment. If the right to payment

is not an alternative remedy, it must at least arise 'with respect to' the equitable remedy, not apart

from it.").

Whether a right to an equitable remedy for breach of performance may be satisfied by an

alternative right to payment is a matter of state law. Id. at 408, citing Butner v. United States,

440 U.S. 48, 54-55 (1979). As noted earlier, the parties agree that the Settlement Agreement is

governed by Rhode Island law. Thus, the bankruptcy court concluded that the "disposition question" in the instant dispute is whether, under Rhode Island law, Shanri's equitable remedy of specific performance can be satisfied by an alternative award of money damages.

At the outset, the bankruptcy court noted that, for the purposes of the motion to dismiss, it would "take[] as true Shanri's allegations that Kmart breached the settlement agreement and that Shanri has an equitable remedy for specific performance." With respect to its analysis of the money damages issue, the court observed that, under Rhode Island law, the granting of specific performance is appropriate only when adequate compensation cannot be achieved through money damages because the item at issue is unique and distinctive, such as land. (Citing <u>Griffin v. Zapata</u>, 570 A.2d 659 (R.I. 1990).) The court also acknowledged that "a Rhode Island court will not decree the specific performance of a contract 'where a complainant has a plain, adequate and complete remedy at law.'" (Quoting <u>Duffy v. Providence Teaming Co.</u>, 49 R.I. 476, 144 A. 106 (R.I. 1929).)

Applying these principles to the instant case, the bankruptcy court stated, "[M]oney is not a unique or distinctive item that requires an equitable remedy to be applied.... So, under Rhode Island law, payment of money damages from Kmart could be a substitute for specific performance in the settlement agreement." According to the bankruptcy court, "In this matter, money damages are an appropriate alternative because they can be computed with precision, $3.5 million, and because money, unlike real property, is not a unique item." The court dispensed with Shanri's argument that the claims allowance process was a "suboptimal remedy" relative to specific performance, noting simply that such a result is "a recognized reality of the bankruptcy process." Thus, the bankruptcy court concluded that Shanri's suit failed to state a cause of

5

action for specific performance because it was a "claim" under Section 101(5)(B) that is subject to the bankruptcy claims allowance process.

On appeal, Shanri contends: (1) the bankruptcy court erred by effectively enjoining a letter of credit that is not part of the bankruptcy estate; and (2) because money damages would be inadequate in comparison to the full proceeds from the letter of credit, Shanri is entitled to specific performance under Rhode Island law. In response, Kmart argues: (1) "typical" letter of credit law does not apply to the instant dispute; (2) an award of specific performance would impinge on Kmart's fiduciary duty to its other creditors; and (3) Shanri's cause of action for specific performance is reducible to money damages under Rhode Island law and thus qualifies as a "claim" under Section 101(5)(B). For the reasons stated below, the court remands the instant case to the bankruptcy court for consideration of the effect, if any, Section 5.3 of Kmart's First Amended Joint Plan of Reorganization will have on Kmart's other creditors in the event that Shanri is permitted to draw on its letter of credit, and whether any such effect would alter the result in the instant dispute.

To begin, the court notes that letters of credit are not considered property of a debtor's estate because, "when the issuer honors a proper draft under a letter of credit, it does so from its own assets and not from the assets of [the debtor] who caused the letter of credit to be issued." Kellogg v. Blue Quail Energy, Inc. (In re Compton Corp.), 831 F.2d 586, 589 (5th Cir. 1987). Thus, when the account party is in bankruptcy, a beneficiary is not prevented from drawing on his letter of credit. See Duplitronics, Inc. v. Concept Design Electronics and Mfg. Inc. (In re Duplitronics), 183 B.R. 1010, 1015 (Bankr. N.D.Ill. 1995) ("It is axiomatic that letters of credit represent obligations of the bank completely independent of the underlying transaction.... General

6

principles of bankruptcy reinforce the independence of the bank's obligation to honor drafts in a letter-of-credit transaction from its rights against its now insolvent customer."). Once the bank makes payment on the letter of credit, it acquires the right to be indemnified by the debtor, and converts its contingent claim against the debtor to an absolute claim. United States Trust Co. of New York v. Revere Copper & Brass, Inc. (In re Revere Copper & Brass, Inc.), 60 B.R. 887, 891 (Bankr. S.D.N.Y. 1985).

Both the bankruptcy court and Kmart contend that these principles do not apply to the instant dispute, however, because Shanri's letter of credit is "atypical." In most letter of credit transactions, the beneficiary tenders a request for payment to the issuer without the need for any action by the party who requested that the letter of credit be issued. In the instant case, in contrast, Kmart is in control of the draw documents: Shanri cannot draw on its letter of credit until Kmart signs a certification acknowledging that certain conditions precedent have occurred. According to Kmart:

> Under bankruptcy law, debtors who remain as debtors-in-possession have a fiduciary duty to maximize the estate's assets for the benefit of all of their creditors.... If the Debtors were required to sign the Certificates as Shanri demands, allowing Shanri to draw on the letter of credit, Shanri's unsecured pre-petition claim would be extinguished and a new fixed, secured claim - with higher priority - would be created on behalf of the Bank. The conversion of Shanri's pre-petition claim to a higher priority would harm the estates' [sic] other creditors, in violation of the Debtors' fiduciary duties.

In support of its argument, Kmart directs the court's attention to In re A.J. Lane Co., Inc., 115 B.R. 738 (Bankr. D. Mass. 1990). In that case, a $150,000 letter of credit was issued for the purpose of releasing a prejudgment attachment of the debtor's assets to secure the debtor's contingent obligation if the creditor was successful in its pending state court litigation. Id. at 739. The letter of credit was to be renewed annually until the entry of a final judgment in the

underlying litigation. If in any year the debtor failed to provide a renewed letter of credit, the debtor agreed to provide an executed stipulation for entry of partial summary judgment in the sum of $150,000 and a statement required under the letter of credit certifying to the entry of partial summary judgment in that amount. An affiliate of the debtor gave the issuing bank a mortgage covering Massachusetts real estate to secure the Bank's indemnification rights against the debtor under the letter of credit. Id.

After filing for bankruptcy, the debtor in A.J. Lane refused to either issue a renewed letter of credit or execute the documents necessary for the beneficiary to draw on its then-existing $150,000 letter of credit. Id. at 740. After the beneficiary sought an order from the state court compelling the debtor to execute the draw documents, the debtor commenced an adversary proceeding seeking a declaration that, as a result of its bankruptcy filing, the debtor's specifically-enforceable obligation to execute the draw documents was transformed into a monetary claim that is allowable and dischargeable in bankruptcy. Id. at 741.

The bankruptcy court in A.J. Lane concluded that the beneficiary's cause of action was a "claim" subject to the bankruptcy claims allowance process. After noting that the beneficiary's claim for $150,000 against the debtor was liquidated and subject to no defenses, the court continued:

> There would be prejudice to other creditors if BSC [the beneficiary] were granted specific performance. The Bank would then have to pay under the letter of credit, thereby changing its $150,000 contingent claim against the Debtor to an absolute claim. Most important, this claim is secured by a real estate mortgage, so that it would have priority over other creditors which is not enjoyed by BSC's $150,000 claim.

Id. at 743.

8

According to at least one commentator, the lesson of A.J. Lane, in which the beneficiary's "Cinderella rights under the letter turned into a pumpkin claim in bankruptcy," is that beneficiaries should avoid placing the applicant for the letter of credit in control of the draw documents. See Albert J. Givray, Survey: Uniform Commercial Code Letters of Credit, 46 BUSINESS LAWYER 1579 (1991).

Shanri responds that A.J. Lane is distinguishable from the instant case in two important respects. First, Shanri argues that the $3.5 million owed by Kmart pursuant to the settlement agreement is liquidated and undisputed, in contrast to the claim in A.J. Lane. As Kmart correctly points out, however, the A.J. Lane court specifically noted that the beneficiary's "new" claim for $150,000, which arose when the debtor failed to renew the letter of credit or execute the draw documents, was "liquidated and subject to no defenses." A.J. Lane, 115 B.R. at 742.

Shanri's second basis for distinguishing A.J. Lane is more persuasive. The decision in A.J. Lane was animated, "most important[ly]," by a concern that the bank's claim, which was secured by a real estate mortgage, would have priority over other creditors' claims. In the instant case, in contrast, the stipulated facts establish that the issuing bank, at the time Kmart's bankruptcy petition was filed, was undersecured. This means that, but for Section 5.3 of Kmart's First Amended Joint Plan of Reorganization, allowing Shanri to draw on the letter of credit would create an unsecured deficiency claim of $3.5 million in favor of the Bank, entitling the Bank only to its pro rata distribution reorganized Kmart stock; the Bank would effectively be substituted in for Shanri as a general unsecured creditor for $3.5 million, without any potential prejudice to the class of unsecured creditors.

As noted earlier, however, Kmart cash collateralized the $3.5 million letter of credit at 105% plus fees on May 6, 2003, pursuant to Section 5.3 of its First Amended Joint Plan of Reorganization. Thus, as the parties' stipulation points out, if Shanri draws on the letter of credit, the Bank will collect $3.5 million (plus taxes and reasonable fees) of Reorganized Kmart's assets.[3]

The parties dispute the origins of Section 5.3, which essentially elevated the Bank's unsecured claim to a secured claim, at the expense of the unsecured creditors. According to Shanri:

> Kmart decided, without any legal obligation and contrary to the Bankruptcy Code, to enter into the Agreement whereby it would pay the Bank $3.5 million in cash upon the event of a draw on the Shanri Letter of Credit. Kmart cannot seriously contend that it can manufacture harm to unsecured creditors to prevent Shanri from drawing on the Letter of Credit when Kmart voluntarily agreed to fully indemnify the Bank in the event of a draw on the Shanri Letter of Credit, thereby causing the alleged harm to the unsecured creditors it now seeks to rely upon as a reason to prevent the draw on the Shanri Letter of Credit.

In response, Kmart maintains that its arguably preferential treatment of prepetition lenders, such as the Bank, arose from a global settlement among the debtors (including certain subsidiaries who had guaranteed Kmart's obligations under certain prepetition credit agreements), prepetition lenders, and the unsecured creditors' committee. According to Kmart:

---

[3]Interestingly, Shanri notes that should Kmart be required to pay the Bank $3.5 million on the letter of credit, the impact on other unsecured creditors would be *de minimus:* "It is arguable that the mid-range of Kmart's equity could be reduced to $1.1245 billion, therefore leaving an *estimated* potential recovery to Class 5 [unsecured] claimholders of 9.68% (vs. the currently estimated 9.7%)." Further, Shanri notes that if it were permitted to draw on the letter of credit, "[Shanri] would withdraw its $3.5 million Class 5 claim, which would thereby reduce the aggregate amount of Class 5 claims, causing allowed Class 5 claimants to receive a higher *pro rata* distribution than projected." On remand, the bankruptcy court should consider these arguments.

Far from a gratuitous decision in favor of the Bank, Kmart's decision to settle involved "a significant amount of time researching the facts, and the law applicable to these matters, and [] innumerable hours analyzing, discussing, and negotiating with one another regarding possible litigation and settlement of the issues." [Quoting Kmart's Disclosure Statement With Respect to First Amended Joint Plan of Reorganization, p. 71.]

Kmart's First Amended Joint Plan of Reorganization, which amended Section 5.3 and provided for the cash collateralization of Shanri's letter of credit, was dated February 25, 2003, nearly three months after the bankruptcy court's oral ruling regarding Kmart's motion to dismiss Shanri's claim for specific performance. Thus, the bankruptcy court did not have an opportunity to consider the effect, if any, of Section 5.3 on the unsecured creditors, and the extent to which the rationale of A.J. Lane applies to the facts of the instant case. This court, as a reviewing court, should not decide this issue for the first time on appeal. Rather, the bankruptcy court should be the first to consider the impact of the First Amended Joint Plan of Reorganization, and Section 5.3 thereof, on the parties' dispute. Thereafter, should there be an appeal, this court can decide the issue on a complete record.

## CONCLUSION

For the reasons set forth above, the instant case is remanded to the bankruptcy court for proceedings consistent with this opinion.

**ENTER:** **August 27, 2003**

**Robert W. Gettleman**
**United States District Judge**

11